IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| **ANTHONY W. GROSS,** ) | |
| ) | |
| Plaintiff, ) | Case No. 1:11CV00023 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | By: James P. Jones |
| **COMMISSIONER OF** ) | United States District Judge |
| **SOCIAL SECURITY,** ) | |
| ) | |
| Defendant. ) | |

*Joseph E. Wolfe, Wolfe, Williams, Rutherford & Reynolds, Norton, Virginia for Plaintiff; Eric P. Kressman, Regional Chief Counsel, Region III, Donald K. Neely, Assistant Regional Counsel, Office of the General Counsel, Social Security Administration, Robert W. Kosman, Special Assistant United States Attorney, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Plaintiff Anthony W. Gross filed this claim challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act (the "Act"). 42 U.S.C.A. §§ 401-433, 1381-1383f (West 2003 & Supp. 2011). Jurisdiction of this court

exists pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3) (West 2003 & Supp. 2011).

Gross filed an application for benefits on August 16, 2007, alleging disability beginning March 31, 2007. The claims were denied initially on November 20, 2007 and on reconsideration on April 28, 2008. A hearing was held before an administrative law judge ("ALJ") on May 13, 2009. At the hearing Gross, represented by counsel, and an independent vocational expert testified. The ALJ denied his claim and that decision became final when the Social Security Appeals Council denied his request for review. Gross then filed his Complaint in this court, objecting to the Commissioner's final decision.

The parties have filed cross motions for summary judgment, which have been briefed. The case is ripe for decision.

II

Gross was born on June 27, 1981, making him a younger individual under the regulations. 20 C.F.R. §§ 404.1563(c); 416.963(c) (2011). He lives with his mother, wife and child, and worked as a cashier, cook and in construction from 1997 to 2007. Gross has a history of drug and alcohol abuse. He claims he is

disabled because of peripheral artery disease of the left leg and depression and anxiety.

Gross began experiencing pain in his left foot and ankle at the end of 2006 and beginning of 2007. On February 19, 2007, he sought emergency treatment for pain and altered sensation in his left foot and ankle. The attending physician diagnosed peripheral vascular disease, not otherwise specified. His foot was described as "cold and pale." (R. at 314.) A complete lower extremity Doppler study was performed showing a "hemodynamically significant stenosis in the left common femoral artery[]" and "severe arterial ischemia in the left lower extremity." (R. at 318.) The ankle brachial index in his left leg was 0.29, well below normal.

Gross was referred to Benjamin S. Scharfstein, Jr., M.D., for treatment for his leg on March 7, 2007. Dr. Scharfstein referred him to his partner D. Nelson Gwaltney, M.D., on March 8, 2007. Gross explained to Dr. Gwaltney that the pain in his left leg had been present for two months and had gotten better but then had gotten dramatically worse. He told the doctor that he had sustained trauma to the left leg several months before. He also admitted to smoking approximately two packs of cigarettes per day. Dr. Gwaltney noted no known history of vascular problems. In examination, Dr. Gwaltney could not feel pulses on the left side below the groin and noted some cyanosis (blue or purple discoloration of the skin

due to tissues being low on oxygen) of the left foot without ulceration. He also observed that Gross's lower extremity arterial studies demonstrated an ABI of less than 0.5 and that Gross's CT scan demonstrated a popliteal occlusion.

On March 13, 2007, Gross underwent arteriography at Bristol Regional Medical Center at Dr. Gwaltney's direction. This demonstrated occlusion of his left popliteal artery and he underwent thrombin therapy whereby he was infused, via catheter, with tissue plasminogen activator ("TPA") and heparin. Dr. Gwaltney observed that Gross regained some perfusion in his lower left leg and was started on Coumadin (an anti-coagulant). Dr. Gwaltney stated that the "popliteal thrombosis was unable to be resolved" but Gross's disease level was such that Dr. Gwaltney did not feel surgical intervention was necessary. He instructed Gross to start a walking program and to quit smoking.

On April 5, 2007, Gross had a follow-up appointment with Dr. Gwaltney. Dr. Gwaltney observed that Gross's symptoms appear "somewhat lessened[]" and that his numbness was decreasing. (R. at 413.) He also saw that Gross's feet were both pink and warm. Gross had stopped smoking by this appointment. Dr. Gwaltney was pleased with Gross's progress. Gross had another follow-up appointment on May 23, 2007. Dr. Gwaltney noted that after Gross's anticoagulation medication had been adjusted, his symptoms were minimal and he was able to walk for at least several city blocks. His feet were still pink and warm,

though his pulses were still decreased. At his August 2007 appointment, Dr. Gwaltney noted that Gross continued to have stable symptoms and was able to walk a significant distance without any pain.

Gross was treated by Dave Arnold, M.D., at the Healing Hands Health Center. Dr. Arnold treated Gross both for his problems with his leg and for his chronic anxiety. In April 2007, Dr. Arnold refilled Gross's prescription for Xanax and in July 2007, Dr. Arnold noted that Gross had taken Xanax for a long time but had never seen a therapist or psychiatrist. At his December 10, 2007 appointment, Gross stated that the pain in his left leg and foot had improved over the past six months and that he was able to walk for fifteen minutes and, though he felt pain while walking, the pain was mild and he was able to continue walking. Throughout his treatment of Gross, Dr. Arnold prescribed different drugs along with Xanax to address his anxiety including Lexapro, Celexa, and Cymbalta. Gross had problems with each of those drugs. For example, Lexapro helped his anxiety but cause mood swings, Celexa increased his anxiety and Cymbalta was ineffective. He also admitted to smoking marijuana to control his anxiety. In January 2008, Gross reported increased anxiety but at his March 2008 appointment he reported that he liked clonazepam (Klonopin) much more than Xanax because it controlled his anxiety without making him feel "drunk." (R. at 457.)

Also at his March 2008 appointment, he reported mild to moderate discomfort in his leg when it was cold. He also said that he would like to start riding a bike and that there was a construction job available to him that involved heavy lifting. He was not sure if these activities would hurt his leg. Dr. Arnold told him that bicycling and construction work are "not contraindicated." (*Id.*)

On April 22, 2008, Richard Mullens, M.D., conducted noninvasive physiologic testing of Gross's lower extremities, single level with exercise testing. Gross's right ankle waveform and ABI were normal at 1.06. However, there was blunting of the left ankle waveform with a decrease in the ABI to 0.55. Gross was then directed to walk for about five minutes. He experienced left calf claudication (cramping in leg or impairment in walking). After the exercise, the ankle pressures in the left leg remained normal. In the left leg, there was a slight drop in the ankle pressure from 85 to 69 mmHg. The ABI decreased to 0.45. At ten minutes, the ABI increased to 0.62. Dr. Mullens concluded that Gross suffered from severe arterial occlusive disease in the left leg with an ABI of 0.55.

On September 16, 2008, Gross received treatment from Brenda Weddington, M.D., at Bristol Family Health. His chief complaint was acid reflux. He reported to Dr. Weddington that he had been on Klonopin for several years and that it "works well." (R. at 492.) Dr. Weddington described him as alert and oriented and in no acute distress. She noted that he favored his left leg and had limited

range of motion in his left knee. At his December 16, 2008 appointment, she noted he had weakness, numbness and tingling in his left leg and that he was anxious. She prescribed more Klonopin.

On November 20, 2007, state agency physician Thomas Phillips, M.D., reviewed the record and concluded that Gross had a determinable impairment of peripheral vascular disease. Dr. Phillips noted that Gross had been treated for the disease and his symptoms are relatively stable. He determined that Gross could lift fifty pounds occasionally, twenty-five pounds frequently, could stand and/or walk about six hours in an eight hour day, could sit about six hours in an eight hour workday, and had unlimited push/pull abilities. He also found that Gross should be limited to frequent balancing, stooping, kneeling, crouching, and crawling, and only occasional climbing.

On March 17, 2008 state agency physician Richard Surrusco, M.D., performed a case analysis on Gross's case. Based upon his February 2007 (pre-treatment) listing level ABI of 0.29, Dr. Surrusco recommended obtaining a resting arterial Doppler and if the ABI was no longer listing level, he would require further evaluation to "determine contraindications to exercise Doppler." (R. at 453.) Dr. Surrusco followed-up in April 2008 with a file review and physical residual functional capacity assessment. He concluded that Gross could lift twenty pounds occasionally and ten pounds frequently, and could stand and/or walk at least two

hours in an eight hour workday. He also concluded that Gross could sit for about six hours in an eight-hour workday, that he had limited lower extremity push/pull ability, and that he could perform postural maneuvers only occasionally and should avoid all hazards. In making these assessments, Dr. Surrusco relied upon the April 2008 ABI of 0.55.

On November 20, 2007, Richard J. Milan, Jr., Ph.D., a state agency psychologist, reviewed Gross's file and concluded that his mental impairments were not severe. He observed that Gross had a history of anxiety but found no functional limitations associated with the anxiety impairment. He noted Gross's daily living activities were not significantly limited by his mental condition and that Gross did not have any apparent difficulties in understanding, answering, coherency or concentrating during face-to-face interviews. Further, he noted no history of psychiatric hospitalizations or any outpatient treatment by a mental health provider at all. On March 31, 2008, Julie Jennings, Ph.D., a state agency psychologist, also conducted a psychiatric file review and came to the same conclusions as Dr. Milan.

At his administrative hearing on May 13, 2009, Gross testified that he walked anywhere from twenty to thirty minutes a day. He said that his leg starts hurting after a few minutes but he can push himself to keep walking for about fifteen minutes. Then he has to stop and sit. He testified that if he sits too long, he

has to get up and if he stands too long, he has to sit. He said he has a constant burning or tingling feeling but if he walks it is more like a bad cramp. He reported that his doctors have told him that his current state is as good as he will get. He also testified that helps his wife babysit the four or five children she cares for in their apartment. Gross testified that he was on Klonopin for his anxiety and before that he had been on Xanax. He stated that the medication for his anxiety helped and, while he still had a job, it enabled him to perform his job. (R. at 52.) However, he also testified that even on the medicine he had panic attacks "a good part of the week," though he indicated that these attacks generally occurred when his medicine was wearing off. (R. at 83-84.)

A vocational expert testified that if Gross would need frequent sit/stand postural changes, he could not do his past work. The ALJ posed the hypothetical individual with Gross's background, sedentary exertional level, requiring brief in-place postural changes and with further limitations including no climbing, no work at height, no overhead lifting, occasional crouching, crawling, stooping or pushing/pulling with legs. Further, the ALJ proposed that the individual, due to the distraction of pain, would have a moderate reduction in concentration, limiting him to simple noncomplex tasks and the ALJ included limited contact with the public. Finally, she included no hazardous machinery and no working outside in the cold. The vocational expert testified that there were some jobs available,

including unskilled clerical work, product inspector, and machine monitor and tender.

At the hearing, counsel for Gross presented the ALJ with a note on a prescription pad signed by Dr. Weddington and dated February 25, 2009. The note said "Patient is unable to work due to multiple medical/psychiatric problems. He is under my care on an ongoing basis." The ALJ marked the note as an exhibit.

Also at the hearing, counsel for Gross raised the argument that Gross's physical impairment arguably met the listing level because of the fluctuation in the ABI scores between the 2007 and 2008 tests. Gross also testified that he did not believe that the second test was done properly because he did not walk on an inclined treadmill but rather was just instructed by the nurses at the hospital to walk around the hospital hallway for five minutes. The ALJ suggested, and counsel for Gross agreed, to find a medical expert to review the ABI scores and assess the listing requirements and address whether the scores meet or equal the requirement. She required counsel for Gross to include Gross's description of the second test in the interrogatory prepared for the medical expert to see whether it affects his evaluation of the scores.

Counsel for Gross prepared an interrogatory as directed and it was sent to H. Christopher Alexander, III, M.D. After reviewing the file, Dr. Alexander concluded that Gross did not meet or equal any listing, specifically the listing for

-10-

Peripheral Arterial Disease. Dr. Alexander opined that after the April 2008 test, "the highest ABI was 0.55, thus not meeting or equaling the required > 0.50 [level] and after exercise the blood pressure in the ankle only decreased 19%, not the 50% decrease required…." (R. at 555.) Further, Dr. Alexander stated:

> This ABI study…comes as close to that being described in 4.00C16 and 4.00C17 as I have encountered in my clinical experience and more detailed than most. Therefore I accept as factual the objective information it conveys without regard as to whether or not the procedure exactly followed 4.00C16 and 4.00C17, since it is what we have is what we have [sic].

(R. at 556.) Finally, he concluded that an inclined walking surface would not better reflect a true ABI value but would rather simply reflect the ABI value for that particular level of stress. Gross's counsel requested another consultative medical examination but the ALJ concluded that it was not required.

After consideration of the evidence, the ALJ found that Gross had severe impairments of peripheral artery disease and a history of depression and anxiety but he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. The ALJ found that Gross had the residual functional capacity to perform sedentary work with certain limitations: the option to alternate sitting and standing for brief in-place postural changes; no pushing or pulling with the left leg, overhead lifting, climbing or work at heights; could occasionally perform other posturals; could not work with hazardous machinery, outside in cold weather, or with the public continuously; could have

limited sporadic contact with the public and could work with other individuals but was limited to simple, noncomplex tasks. The ALJ concluded that Gross was unable to perform any past relevant work but, based on the testimony from the vocational expert, could have performed other jobs that existed in significant numbers in the national economy. The ALJ concluded Gross was not under a disability.

Gross argues the ALJ's decision is not supported by substantial evidence. For the reasons below, I disagree.

## III

The plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. §§ 423(d)(2)(A); 1382c(a)(3)(B).

In assessing DIB claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has

-12-

a condition that meets or equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4) (2011). If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases. *Id*. The fourth and fifth steps of the inquiry require an assessment of the claimant's residual functional capacity ("RFC"), which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id.*; *Johnson v. Barnhart*, 434 F.3d 650, 653-54 (4th Cir. 2005).

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. *Seacrist v. Weinbarger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). It is

not the role of this court to substitute its judgment for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Gross first argues that the ALJ erred when she failed to find that he met or medically equaled the listing requirement for peripheral artery disease. Gross asserts that the evidence presented overall required the finding that he was disabled due to peripheral artery disease. He also argues that the ALJ committed procedural error in relying upon a Doppler test which did not comply with the regulations' requirements.

> The relevant sections of listing requirement 4.12 state:
>
> Peripheral arterial disease, as determined by appropriate medically acceptable imaging . . . , causing intermittent claudication and one of the following:
>
> A. Resting ankle/brachial systolic blood pressure ratio of less than 0.50.
>
> OR
>
> B. Decrease in systolic blood pressure at the ankle on exercise […] of 50 percent or more of pre-exercise level and requiring 10 minutes or more to return to pre-exercise level.

20 C.F.R. pt. 404, Subpt. P, App. 1, § 4.12 (2011). The impairment must be shown to have lasted or be expected to last twelve consecutive months. 20 C.F.R. §§ 404.1505(a), 416.905(a). Thus, a claimant meets or equals the listing requirement if he can show that he has peripheral arterial disease causing intermittent claudication and if he either has a resting ABI of less than 0.50 OR he experiences

-14-

Case 1:11-cv-00023-JPJ-PMS Document 17 Filed 01/19/12 Page 14 of 19 Pageid#: 637

a decrease in systolic blood pressure at the ankle on exercise of fifty percent or more of pre-exercise level and requiring ten minutes or more to return to that pre-exercise level. Then he must show that this impairment lasted for twelve consecutive months.

There is no dispute that Gross has peripheral arterial disease causing intermittent claudication. Further, it is clear that Gross met the listing requirement in February 2007, prior to his treatment by Dr. Gwaltney. At that point, his ABI was 0.29. There is also no dispute that, at the April 2008 test, his resting ABI was 0.55, above the level of 0.50 stated in the listing requirement and his blood pressure in his ankle decreased only 19%, not the 50% required by the listing requirement. These test results, read along with the wealth of other evidence indicating Gross's condition improved significantly after his therapy with Dr. Gwaltney, support the ALJ's conclusion that he did not meet or medically equal the listing requirement for peripheral artery disease. After his thrombin therapy, the pain in his legs lessened considerably. In March 2008, Gross reported only mild to moderate leg discomfort and was considering taking up bicycling and taking a heavy construction job. Both activities were given the green light by Dr. Arnold. Further, Gross himself testified that he walks every day,

Gross argues that the April 2008 test was procedurally faulty because it did not comply with the regulations requirements for such tests. At his hearing, Gross

testified that the exercise test was not performed on a treadmill but rather he was told to walk around the halls of the hospital for five minutes and he stopped occasionally to find his way around.

The regulations provide the following relevant standards for the reports of performance of exercise Doppler tests:

> The reports of exercise Doppler tests must describe the level of exercise; for example, the speed and grade of the treadmill settings, the duration of exercise, symptoms during exercise, and the reasons for stopping exercise if the expected level of exercise was not attained. They must also include the blood pressures at the ankle and other pertinent sites measured after exercise and the time required for the systolic blood pressure to return toward or to the pre-exercise level.

20 C.F.R. pt. 404, Subpt. P, App. 1, § 4.00(C)(16) (2011).[1] The April 2008 report does not appear to contain the level of detail outlined in the regulation. However, Gross raised this concern to the ALJ at his hearing and she agreed to seek an independent review of the test both to assess the meaning of the numbers and to assess the validity of the test as reported. Gross, through his counsel, agreed to this independent review. Dr. Alexander reviewed the report, accepted its findings and noted that it was more detailed than most such reports he sees. He also noted that that an inclined walking surface would not better reflect a true ABI value but would rather simply reflect the ABI value for that particular level of stress.

---

[1] Gross argues that the March 2008 test did not comply with § 4.00(C)(17). That section applies to exercise Doppler tests purchased by the agency. The March 2008 test was not purchased by the agency and so falls under § 4.00(C)(16).

-16-

Gross argues that because his ABI numbers are so close to the listing level requirement and there is a suggestion that the April 2008 test was not performed properly, the evidence is not sufficient to determine he is not disabled. However, Gross focuses on the 0.55 ABI number, a number which, because it was his resting ABI, was unaffected by the exercise Doppler test. After the exercise Doppler test, Gross's ABI dropped but only 19%, not close to the 50% required to meet the listing requirement. Given Dr. Alexander's expert review of the April 2008 numbers and testing procedures and the other evidence of Gross's improvement after his treatment, there was sufficient evidence for the ALJ to determine that Gross did not meet the listing requirements for peripheral artery disease.

Gross also argues that the ALJ's determination of his RFC is not supported by substantial evidence. His argument seems to be that there is insufficient evidence in the record to support the ALJ's RFC determination as to his mental status because, he asserts, the only medical opinions related to his mental status are from non-examining state agency psychologists and failed to consider all of the relevant evidence, namely records from Bristol Family Health and Dr. Weddington's prescription pad note.

The ALJ has the exclusive duty to determine a claimant's RFC. 20 CFR §§ 404.1546(c), 416.946(c). When formulating the RFC assessment, it is the duty of the ALJ to resolve conflicting medical evidence. *See Smith v. Chater*, 99 F.3d 635,

638 (4th Cir. 1996). In assessing Gross's RFC as it related to his mental impairments, the ALJ relied on the record, which established that while Gross has a history of reported depression and anxiety, those disorders have responded to drug treatment, particularly Klonopin. Further, even with this long reported history, Gross was never hospitalized for psychiatric problems and never sought psychological therapy. The reports from the state agency psychologists agreed with these facts and concluded that his mental impairment was not severe. The records from Bristol Family Health do not contradict this evidence. The notes describe Gross as alert and oriented. Dr. Weddington, relying on Gross's own information that Klonopin "works well," prescribed him Klonopin for his anxiety and depression. (R. at 492.)

The ALJ's decision not to accord significant weight to Dr. Weddington's note opining that Gross was "unable to work due to multiple medical/psychiatric problems" was within her discretion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). The ALJ found that Dr. Weddington's note was inconsistent with her own notes and medical records and with other evidence in the record, including the assessments by the state agency doctors and Gross's own description of his activities. *See Craig*, 76 F.3d at 590 ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."). In addition, Dr. Weddington's opinion

that Gross is "unable to work" is not a medical opinion but rather an opinion on the issue reserved to the Commissioner whether Gross is disabled. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1) (2011).

The state agency psychologists concluded that Gross's mental impairments were not severe. The ALJ disagreed with their conclusions, based on Gross's testimony, and found that his depression and anxiety were severe impairments. (R. at 16). In making the RFC assessment, she considered his mental impairments and limited the amount and nature of contact with people in any possible workplace situation. This finding is supported by substantial evidence.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: January 19, 2012

/s/ James P. Jones
United States District Judge

-19-

Case 1:11-cv-00023-JPJ-PMS   Document 17   Filed 01/19/12   Page 19 of 19   Pageid#: 642